**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ROBIN P.,**

                              **Plaintiff,**

        **vs.**                                          **1:20-CV-863**
                                                          **(TJM)**


**COMMISSIONER OF SOCIAL SECURITY,**

                              **Defendant.**
_____

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**


**DECISION & ORDER**

        Plaintiff Robin P. brings this action pursuant to the Social Security Act, 42 U.S.C. §

405(g), for review of a final determination by the Commissioner of Social Security denying

her application for benefits.  Plaintiff alleges that the Administrative Law Judge's ("ALJ")

decision denying her application was not supported by substantial evidence and contrary

to the applicable legal standards.  Pursuant to Northern District of New York General

Order No. 8, the Court proceeds as if both parties had accompanied their briefs with a

motion for judgment on the pleadings.

**I.      BACKGROUND**

        Plaintiff Robin P. filed this action pursuant to 42 U.S.C. § 405(g) to appeal the

Defendant Commissioner of Social Security's denial of her claim for disability benefits.

        Plaintiff filed her application for disability insurance benefits May 31, 2017.  See

1

Social Security Administrative Record ("R"), dkt. # 10, at 141-147.  After an initial

determination denied her application, Plaintiff obtained a representative and appealed the

decision.  See R. at 66-89.  After a hearing, an Administrative Law Judge ("ALJ") denied

Plaintiff's request for benefits in a written decision.  See R. at 7-26.  The Social Security

Appeals Council denied Plaintiff's appeal.  Id. at 1-6.  Plaintiff filed the instant action on

August 3, 2020.  See dkt. # 1.  After the Court received the administrative record,

Plaintiff's attorney filed a brief in support of her appeal, and the Commissioner filed a brief

in opposition.  See dkt. #s 13,14.  The matter is now before the Court

## II.    FACTS

The Court will assume familiarity with the facts and set forth only those facts

relevant to the Court's decision in the body of the decision below.

## III.   THE ADMINISTRATIVE LAW JUDGE'S DECISION

Administrative Law Judge Mary Sparks rendered a decision on Plaintiff's case on

March 21, 2019.  See R, at 7-26. The ALJ noted that Plaintiff had filed a Title II application

for a period of disability, alleging that her disability began on May 31, 2017.  Id. at 10.  The

ALJ concluded that the issue in this case was whether Plaintiff had a disability "under

sections 216(i) and 223(d) of the Social Security Act."  Id.  The ALJ found that Plaintiff had

sufficient earnings to "remain insured through March 31, 2020."  Id.  As a result, Plaintiff

needed to show that she was disabled "on or before that date in order to be entitled to a

period of disability and disability insurance benefits."  Id.  The ALJ concluded that Plaintiff

was not disabled at the relevant time.  Id.

In reaching her decision ALJ Sparks followed the "five-step sequential evaluation

2

process" outlined in the Social Security regulations.  Id. at 11.  At Step One, the ALJ

determined that Plaintiff had not engaged in substantial gainful activity since May 31,

2017, the alleged onset date of her disability.  Id. at 12.  At Step Two, the ALJ concluded

that Plaintiff had offered evidence of several severe impairments: "major depressive

disorder; post-traumatic stress disorder (PTSD); generalized anxiety disorder; and

myalgias."  Id.  Such impairments, the ALJ found, "significantly limit the ability to perform

basic work activities."  Id.  While the record offered some evidence in laboratory records

that Plaintiff suffered from rheumatoid arthritis, nothing in the record revealed such a

diagnosis.  Id.

At Step Three, the ALJ found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled the severity of a listed

impairment.  Id.  Plaintiff's myalgia did not met the requirements "because the claimant

does not have persistent deformity or inflamation in one or more major peripheral weight-

bearing[] joints resulting in the inability to ambulate effectively[.]"  Id.  Neither did Plaintiff

offer evidence that she had "inflammation or deformity in one or more major peripheral

joints to each upper extremity resulting in the inability to perform fine and gross

movements effectively."  Id. at 13.  Plaintiff also did not suffer from ankylosing spondylitis

or other spondyloarthropathies."  Id.  She had not experienced "repeated manifestations of

inflammatory arthritis with at least two other constitutional symptoms or signs . . . in

conjunction with marked limitations in understanding, remembering, or applying

information, interacting with others, concentrating, persisting or maintaining pace, or in

adapting or managing oneself."  Id.

Plaintiff's mental impairments were also not severe enough to meet one of the

listed impairments, considered either singly or in combination.  Id.  To qualify, the ALJ

found, Plaintiff had to demonstrate that "the mental impairments . . . result[ed] in at least

one extreme or two marked limitations in a broad area of functioning, which are:

understanding, remembering, or applying information; interacting with others;

concentrating, persisting, or maintaining pace; or adapting or managing themselves."  Id.

The ALJ found that Plaintiff had "a moderate limitation" when it came to "understanding,

remembering, or applying information."  Id.  Plaintiff "reported that she could follow spoken

instructions if . . . not too complex," and that she needed "to re-read written instructions."

Id.  The ALF cited to the opinion of consultative examiner Jennifer Ochoa, Psy. D., who

"reported that the claimant's memory was impaired secondary to anxiety."  Id.  Plaintiff

could "recall four out of four words immediately and one out of four after a five-minute

delay."  Id.  Her "[m]aximum digits forward was five and maximum digits backwards was

four."  Id.  A state psychiatric consultant, M. Tatar, PhD, found "that the claimant was

moderate [sic] impaired in her ability to understand and remember detailed instructions."

Id.

In terms of Plaintiff's ability to concentrate, persist, and maintain pace, the ALJ

found Plaintiff with "a mild limitation."  Id.  While Plaintiff reported trouble reading, the ALJ

noted that Plaintiff also "indicated that she is on the computer for hours a day."  Id.  Dr.

Ochoa found a "mild" impairment in "attention and concentration."  Id.  Plaintiff could

"count, do simple calculations, and serial threes with one technical error."  Id.  Plaintiff

stated she could not perform "serial sevens."  Id.  Dr. Tatar found that Plaintiff could

"maintain attention and concentration."  Id.

The ALJ found "moderate limitation" in Plaintiff's ability to adapt or manage herself.

4

Id. at 14.  Plaintiff claimed she could care for her personal needs, though she explained that she sometimes lacked motivation to do so.  Id.  Plaintiff could prepare simple meals, do laundry, and shop.  Id.  Pain sometimes limited her ability to shop.  Id.  Plaintiff could drive alone and "handle her finances."  Id.  Plaintiff appeared "appropriately dressed and well groomed," making "appropriate eye contact" when she met Dr. Ochoa.  Id.  Dr. Ochoa found "no evidence of limitation in awareness of normal hazards" and concluded that Plaintiff took "appropriate precautions."  Id.  "Dr. Tatar opined that the claimant was moderately impaired in the ability to respond appropriately to changes in the work setting." Id.

In the end, the ALJ found that, since Plaintiff lacked marked limitations in two areas or extreme limitations in one area, she had failed to meet the disability criteria for paragraph B.  Id.

The ALJ also considered whether Plaintiff met the criteria laid out in "'paragraph C'" and found that she did not.  Id.  The evidence did not establish any "medically documented history of the existence of a disorder over a period of at least 2 years, with evidence of both medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of" Plaintiff's "mental disorder."  Id.  The ALJ also saw no evidence of "marginal adjustment, with minimal capacity to adapt to changes in environment or to demands that are not already part of daily life."  Id.

At Step Four, the ALJ determined that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(c)."  Plaintiff would, however, be "limited to performing simple repetitive jobs defined as those having no more than one to

5

two tasks and the jobs would need to be low stress jobs, defined as those having no more than occasional changes in the work setting, and she could have no more than occasional interaction with the public, coworkers, or supervisors." Id. The ALJ noted that "'[m]edium' work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds, standing and/or walking primarily, and frequent bending, stooping, and crouching." Id. A person who can do medium work can also do light or sedentary work. Id.

In making this determination, the ALJ analyzed Plaintiff's symptoms and the medical evidence that supported them. Id. at 15. The ALJ noted that, in a disability report completed at the time of her application, Plaintiff claimed that she could not work because of "depression, anxiety, personality disorder, paranoia, and pain in both legs." Id. Plaintiff stopped working on May 30, 2017 because of these conditions. Id.

Plaintiff prepared a function report with the help of her son. Id. The report indicated that Plaintiff lived alone. Id. On a normal day, Plaintiff had coffee, fed her cats, did yoga, ate breakfast, and went on her computer. Id. She also did errands like going to the market, went to appointments, made phone calls, and chatted with her sisters on Facebook. Id. Plaintiff could groom herself, but she was often too tired to do so. Id. Fatigue also prevented Plaintiff from preparing more than "simple meals." Id. She sometimes went out to eat. Id. Fatigue also prevented Plaintiff from performing household chores, and her house was "a mess." Id. Plaintiff did not do outside chores because her lawnmower broke and she cannot pull weeds. Id. Plaintiff also reported that "[h]er brain 'does not shut off' and she has racing, angry, or worried thoughts." Id. Plaintiff stated that "when a couple of things happen in a row, she gets upset and cries." Id. At

6

work, Plaintiff "thought that someone . . . was . . . leaving things in the way or spitting in her building.  She said she could not take it anymore, so she retired."  Id.  Plaintiff also reported that she had difficulty "lifting, standing, walking, climbing stairs, and squatting due to pain in her legs."  Id.

Plaintiff testified that she had worked as a cleaner at the State University of New York.  Id.  Her work involved "cleaning classrooms, common areas in dorms, bathrooms, stairs, and lounges."  Id.  Plaintiff vacuumed, mopped, and carried "up to 20 pounds."  Id.  Plaintiff had also served in the Army Reserves.  Id.  She first served one weekend per month, and then two weeks per year.  Id.  Plaintiff worked in the Reserves as a supply sergeant who ordered supplies for doctors and nurses.  Id.  Plaintiff also helped erect tents and participated in "mock scenarios."  Id.

Plaintiff reported that "[s]he had to lift and carry about 25 pounds, mostly standing and walking."  Id.[1]  Plaintiff could sit for about an hour and one-half each shift.  Id.  Plaintiff reported that she stopped working because of severe leg pain and arthritis in both knees. Id.  She testified that she had pain from her hip muscles down her whole leg, and that her neurologist told her that she had neuropathy."  Id.  Plaintiff underwent physical theraphy and reported that yoga "seems to be the only thing that helps."  Id.  Plaintiff needed "to move her legs and stretch."  Id.  She testified that the bottom of her feet hurt and that she needed to wear well-cushioned shoes when she walked on hard surfaces.  Id. at 15-16. Plaintiff usually took a motorized cart while shopping.  Id. at 16.  Plaintiff reported that sitting for more than 45 minutes caused her pain in her hips.  Id.  Plaintiff continued to sit

---

[1]The ALJ does not make clear whether this description of work requirements applies to the job in the Reserves, but context seems to indicate that it does.

despite this pain.  Id.  Plaintiff also claimed to have a diagnosis of osteoporosis.  Id.

Plaintiff also claimed to have suffered a "total breakdown in 2013."  Id.  Plaintiff described

this mental health difficulty as "being in a dark hole," which she "had to work hard to get

out of."  Id.  Dr. Guptill had prescribed Wellbutrin to address that issue, and Plaintiff sought

a therapist for those issues.  Id.  She had seen Dr. Nalbone.  Id.

The ALJ concluded that Plaintiff's "medically determinable impairments could

reasonably be expected to cause the alleged symptoms," but that Plaintiff's "statements

concerning the intensity, persistence, and limiting effects of those symptoms are not

entirely consistent with the medical evidence and other evidence in the record[.]"  Id.

The ALJ found Plaintiff's "statements about the intensity, persistence, and limiting

effects of her symptoms . . . inconsistent with the medical evidence of record."  Id.  The

ALJ pointed to the medical record in reaching this conclusion.  Id. at 16-17.  While Gloria

Guptill, MD's October 11, 2016 exam noted that Plaintiff "was receiving treatment for

major depressive disorder and anxiety and . . . seeing a counselor and a psychiatrist for

medication management," she also found that Plaintiff's "physical exam was

unremarkable."  Id. at 16.  Further, Guptill found that Plaintiff's "anxiety and depression

were stable" and her "chronic pain was controlled" by medication.  Id.

The ALJ reported that Kieran Liggan-Casey, a psychiatric nurse practitioner,

"reported on March 20, 2017, that" Plaintiff "was not doing well."  Id.  Plaintiff had conflicts

with coworkers, felt those coworkers acted deliberately to provoke her, and found herself

increasingly "'ranting.'"  Id.  Plaintiff felt that this stress made continuing to work too difficult

and asked about applying for Social Security disability.  Id. at 16-17.  Liggan-Casey

addressed medication and therapy, and on April 11, 2017, Plaintiff "stated . . . that her

medications seemed to be working and she was no longer yelling at work." Id. at 17.  An

examination by Elizabeth Dernis, LCSW-R on April 25, 2017 revealed that Plaintiff

exhibited "constant leg shaking and hand wringing," but that her "[t]hought processes were

coherent and oganized" her "[a]ssociations . . . normal." Id.  Plaintiff offered a "mood and

affect" that was "anxious, congruent, stable." Id.  Plaintiff's "attention and concentration

appeared normal and she was able to attend to the normal flow of interaction

appropriately." Id.  Plaintiff's "memory appeared intact."  Dernis "diagnosed chornic PTSD

and major depressive disorder, recurrent episode, without mention of psychotic behavior."

Id.  Plaintiff saw Liggan-Casey face-to-face on May 4, 2017. Id.  Plaintiff felt

"overwhelmed" by pressure at work as the graduation ceremony approached, but "felt . . .

she was overall functioning well." Id.  Plaintiff found benefits from therapy but needed to

wait to continue until she starting receiving her pension in July 2017. Id.

Victoria Michaels, MD, a rheumatologist, saw Plaintiff on May 5, 2017, hearing

"complaints of a long-standing history of discomfort in [Plaintiff's] knees and lower

extremities." Id.  Prior treatment for that discomfort in the form of steroid injections had

only a "marginal benefit." Id.  Most of Plaintiff's physical exam was unremarkable, but she

received injections in both knees. Id.  Michaels concluded that Plaintiff's "symptoms were

most consistent with evolving osteoarthritis/degenerative joint disease." Id.  X-rays of both

knees "were unremarkable." Id.

The opinion also summarizes medical records from later in 2017 and in 2018. See

id. at 19-20.  A session with Liggan-Casey on July 12, 2017 found Plaintiff without

Cymbalta or Seroquel for a few days and feeling her "irritability coming back." Id. at 19.

Liggan-Casey encouraged Plaintiff to keep more frequent appointments and "to establish

with a therapist if she felt her symptoms were severe enough to warrant disability." Id. A session on October 23, 2017 found Plaintiff "jittery, scattered, disorganized, and her memory was poor." Id. She had trouble "sitting in her chair" and seemed "anxious" and "inattent[ive]." Liggan-Casey changed Plaintiff's medication. Id. Dr. Guptill treated Plaintiff on February 16, 2018. Id. Plaintiff reported that "she was selling her house and was very busy cleaning and donating things." Id. She claimed to have her mental illnesses under control, but reported that she was undergoing physical therapy and had trouble walking long distances. Id. A physical exam showed nothing remarkable, and "[s]he had a normal gait, and normal mood and affect." Id.

Marianne Nettina, NPP, saw Plaintiff in January 2018 and continued such treatment on May 25, 2018. Id. In May, Plaintiff reported that "[s]he continued to have fluctuations in mood, was trying to address her hoarding behaviors, and . . . was trying to clean things out of her house so she could sell it." Id. Nettina adjusted Plaintiff's dose of Lamictal "for better mood stabilization." Id. Plaintiff's mood was worse on July 18, 2018; she "was very jittery and anxious," and reported that she feld "short-tempered later in the day." Id. at 20. She "rarely" took Xanax, and Nettina suggested she try taking one in the morning to aid with anxiety. Id. Plaintiff had "unremarkable" mental status exams on August 8 and August 28, 2018, though Plaintiff continued to suffer from "some anxiety and had trouble saying things without a filter." Id. Plaintiff expressed continued anxiety related to her up-coming Social Security hearing on September 27, 2018, though "[h]er mood was overall good." Id.

Plaintiff saw Dr. Michaels again on September 21, 2018, complaining of "achiness in her legs and discomfort from the hips down." Id. She reported that a neurologist had

told her she suffered from neuropathy.  Id.  Plaintiff stated that she bought thick-soled shoes to avoid pain on her feet from the floor .  Id.  Still, a musculoskeletal exam was "unremarkable" and Plaintiff had full range of motion in all her joints, normal muscle tone and strength in her upper and lower extremities.  Id.  Plaintiff received knee injections and Dr. Michaels recommended physical therapy.  A September 24, 2018 lubmosacral spine x–ray came back normal.  Id.

The ALJ also described the opinion evidence.  Id. at 18-20.  Josephn Prezio, MD, provided a consultative internal medicine exam on July 13, 2017 pursuant to the Social Security Administration's request.  Id. at 18.  Prezio examined Plaintiff and found "mental issues, post colon cancer with a permanent colostomy, hypertension, leg pain, myalgic in nature, and bilateral knee pain that may represent early degenerative joint disease."  Id. Based on his physical, Dr. Prezio concluded that Plaintiff "had mild-to-moderate limitation with respect to engaging in any prolonged standing, walking squatting, kneeling, bending, or heavy lifting or carrying of any significant weight in view of the myalgic presentation in her thighs and calves and both knees being an issue."  Id.  He found that Plaintiff "should be cautious with engaging in any height of any nature without appropriate guardrails for support."  Id.  The ALJ found that Prezio's opinion should receive "some weight . . . as it is consistent with his examination and consistent with objective evidence of record, however, it is vague and he only saw [Plaintiff] on one occasion."  Id. at 18-19.

R. Mohanty, M.D., a state agency medical consultant, found that Plaintiff "could lift, carry, push and pull 50 pounds occasionally and 25 pounds frequently."  Id. at 19.  He also concluded that Plaintiff "could stand/walk about six hours and sit about six hours in an eight-hour workday with normal breaks."  Mohanty reached this opinion after he "reviewed

11

all the evidence of record on August 1, 2017." Id. The AL gave "great weight to this opinion, as it is consistent with the record, including the negative imagings, near normal physical examinations, and the claimant's considerable activities of daily living." Id.

Another state agency consultant, M. Tatar, PhD, "reviewed the evidence of record" concerning Plaintiff's mental limitations. Id. Tatar concluded that Plaintiff "had mild limitations in ability to understand, remember or apply information, moderate limitation in ability to interact with others, moderate limitations in ability to concentrate, persist, or maintain pace, and no limitation in ability to adapt or manage oneself." Id. Tatar found that the evidence did not meet the "C" criteria. Id. The ALJ assigned this opinion "great weight, as it is consistent with the evidence of record, including the consultative examiner's findings, and" Plaintiff's "considerable activities of daily living." Id.

On October 29, 2018, Nettina and James Nalbone, M.D., filled out a questionnaire related to Plaintiff's limitations. Id. at 20. They reported that Plaintiff had been "seen monthly for medication management." Id. Nettina and Nalbone concluded that Plaintiff "was unable to meet competitive standards in ability maintain attention for two-hour segments, work in coordination with or proximity to others without being unduly distracted, and in her ability to ask simple questions or request assistance." Id. The two further found Plaintiff "seriously limited, but not precluded, in eight areas, including ability to understand and remember very short and simple instructions." Id. Plaintiff "had confusion with multifaceted jobs and trouble beyond simple directions." Id. She was not able "to deal with the stress of semi-skilled and skilled positions and stated that she had difficulty with comprehension a times." Id. She "had [no] to mild restriction in activities of daily living, marked difficulties in maintaining social functioning, and moderate difficulties in

maintaining concentration, persistence or pace." Id.  Stressful situations also caused

trouble. Id.  Plaintiff, they found, had "paranoia, extreme anger issues, and" cannot

"handle a work schedule." Id.  The ALJ gave this opinion "some weight," but found that

"this checklist-style form appears to have been completed as an accommodation to the

claimant and includes only conclusions regarding functional limitations without any

rationale for those conclusions." Id.  The ALJ found the opinion "has no probative value

because it is not supported by the treatment notes or records." Id. at 21.  In addition, "the

office notes show that the claimant was seen for sessions lasting only 15 to 20 minutes for

medication management by nurse practitioners.  There are no office notes indicating that

Dr. Nalbone provided any treatment." Id.

        Nurse Practitioner Ellen Regal completed a checkbox questionnaire on October 31,

2018. Id.  She reported that she saw Plaintiff three times each year during twenty-minute

appointments. Id.  Regal offered diagnoses of "chronic pain, bilateral lower extremity pain,

osteoarthritis, borderline personality disorder, anxiety, and depression." Id.  Regal found

that Plaintiff "could walk two blocks or one block uphill.  She could sit 20 minutes and

stand 15 minutes at one time.  She could sit, stand, and walk less than two hours in an

eight-hour workday." Id.  Plaintiff required "a job . . . permitting shifting positions at will.

She must walk every 30 minutes for 10 minutes." Id.  Plaintiff also required the ability "to

take unscheduled breaks three to four times per day for up to 30 minutes before" she

"returned to work." Id.  Plaintiff could "never lift or carry even less than 10 pounds."  She

could only "rarely twist, stoop, crouch/squat, climb stairs or climb ladders." Id.  Plaintiff

"could tolerate minimal work stress." Id.  She had "chronic bilateral leg pain, arthritis, and

osteoarthritis." Id.  Her conditions meant that Plaintiff "would likely miss about two days

per month[.]"  She could not "tolerate excessive noise."  Id.  The ALJ assigned "little weight to this opinion, as it is inconsistent with the medical record.  X-rays were consistently unremarkable, as were physical examination findings.  This opinion is also inconsistent with the claimant's considerable activities of daily living."  Id.

The ALJ also found that Plaintiff's complaints of "significant leg pain and back pain" did not have support in the record.  Id.  The record mentioned more than once "that the claimant was working on getting her house ready to sell, including cleaning out and donating items, as well as cleaning and scraping paint."  Id.  Plaintiff lived alone and could care for "personal needs, shop, handle her finances, drive a car and take public transportation."  Id.  Plaintiff spent hours every day on her computer.  Id.

At Step Five, the ALJ found that Plaintiff could perform her past relevant work as a housekeeper/cleaner.  Id.  Such work did "not require the performance of work-related activities precluded by the claimant's residual functional capacity."  Id.   The ALJ noted that Plaintiff had worked from October 1990 until May 2017 as a janitorial worker on a college campus.  Id.  Plaintiff's residual functional capacity permitted her to perform her past job duties "as actually and generally performed."  Id. at 21-22.  The testimony of a vocational expert, the ALJ found, supported this conclusion.  Id. at 22.

As a result, the ALJ found that the Plaintiff was not disabled during the relevant time period.

## IV.    STANDARD OF REVIEW

The Court's review of the Commissioner's determination is limited to two inquiries.  See 42 U.S.C. § 405(g).  First, the Court determines whether the Commissioner applied the correct legal standard. See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999);

Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990); Shane v. Chater, No. 96-CV-66, 1997 WL 426203, at *4 (N.D.N.Y July 16, 1997)(Pooler, J.)(citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).  Second, the Court must determine whether the Commissioner's findings are supported by substantial evidence in the administrative record. See Tejada, 167 F.3d at 773; Balsamo, 142 F.3d at 79; Cruz, 912 F.2d at 11; Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).  A Commissioner's finding will be deemed conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g); see also Perez, 77 F.3d at 46; Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)("It is not the function of a reviewing court to determine *de novo* whether a Plaintiff is disabled.  The [Commissioner's] findings of fact, if supported by substantial evidence, are binding.")(citations omitted).

In the context of Social Security cases, substantial evidence consists of "more than a mere scintilla" and is measured by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)).  Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. See Quinones v. Chater, 117 F.3d 29, 36 (2d Cir. 1997)(citing Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)); Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990).  Although the reviewing court must give deference to the Commissioner's decision, a reviewing court must bear in mind that the Act is ultimately "'a remedial statute which must be 'liberally

15

applied;' its intent is inclusion rather than exclusion.'" <u>Vargas v. Sullivan</u>, 898 F.2d 293, 296 (2d Cir. 1990)(quoting <u>Rivera v. Schweiker</u>, 717 F.2d 719, 723 (2d Cir. 1983)).

## V.    ANALYSIS

The Plaintiff offers several grounds for challenging the ALJ's decision, which the Court will address in turn.

### A.    Opinion Evidence

Plaintiff first argues that the ALJ did not properly assess the opinion evidence.  She points out that the state-agency non-examining physicians did not have the benefit of examining 125 pages of medical evidence acquired after they rendered their opinions, but the ALJ still gave those opinions "great weight."  She also complains that the ALJ did not assign proper weight to the opinions.

The Plaintiff disputes the evidentiary weight that the ALJ gave the various expert opinions.  For claims made after March 27, 2017, the ALJ is to consider the opinion evidence pursuant to the rules stated in 20 CFR 404.1520c.  Pursuant to that regulation, the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling eight, to any medical opinion(s) or prior administrative medical finding[s], including those from your medical sources."  20 CFR 404.1520c(a).  The Administration applies factors laid out in 20 CFR 404.1520c(c)(1)-(c)(5) in evaluating such opinions.  <u>Id.</u>  Those factors consider the medical opinion's:  "(1) supportability"; "(2) consistency"; the opinion author's "(3) relationship with the claimant," including the "length of the treatment relationship," "frequency of examinations," "purpose of the treatment relationship," "extent fo the treatment relationship," and whether the opinion author

16

examined the claimant; (4) the "[s]pecialization" of the opinion author; and (5) other relevant factors, such as the author's familiarity with the underlying evidence or the rules of the disability program.  20 CFR 404.1520c(c)(1)-(c)(5).  The Administration also considers "whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical findings makes the medical opinion or prior administrative medical finding more or less persuasive." 20 CFR 404.1520c(c)(5).

These new rules "made the [earlier] 'treating physician rule' inapplicable to disability claims filed after March 27, 2017, and gave the ALJ and Commissioner more flexibility in weighing medical opinions on record."  Skartados v. Comm'r of Soc. Sec., No. 20-cv-3909, 2022 U.S. Dist. LEXIS at *24 n.9 (E.D.N.Y. Feb. 10, 2022).  For such claims, "no particular deference or special weight is given to the opinion of the treating physician," and the Administration "'will articulate in our determination or decision how persuasive we find all of the medical opinions.'" Quiles v. Saul, No. 19cv11181, 2021 U.S. Dist. LEXIS 41725 at *27 (S.D.N.Y. Mar. 5, 2021) (quoting 20 CFR 4040.1520c(b), 416.920c(b)).  In offering this evaluation, "the ALJ must 'explain,' in all cases, 'how [he or she] considered' both the supportability and consistency factors, as they are 'the most important factors.'" Segarra v .Comm'r of Soc. Sec., No. 20cv5801, 2022 U.S. Dist LEXIS 29171 at *27 (S.D.N.Y. Feb. 17, 2022) (quoting 20 CFR 404.1520c(b)(2)).  In addition, "the ALJ is required to consider, but need not explicitly discuss, the three remaining factors (i.e., relationship with the claimant, specialization, and 'other')" when evaluating the medical opinions.  Velasquez v. Kijakazi, No. 19cv9303, 2021 U.S. Dist. LEXIS 183349 at *59 (S.D.N.Y. Sept. 24, 2021). If the ALJ finds "two or more medical opinions . . . equally supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered

those three remaining factors."  Id.  "[T]he nature of an ALJ's inquiry in disability factfinding turns on the substance of the medical opinion at issue–not its form–and ultimately whether there is reasonable evidence in the record that supports the conclusions drawn by the medical expert[.]" Colgan v. Kijakzi, 222 F.3d 353, 2022 U.S. App. LEXIS 53, at *14 (2d Cir. 2022).

The evidence related above indicates that the ALJ evaluated the opinion evidence according to these standards.  The ALJ described the relationship between the Plaintiff and the evaluators, as well as the evidence on which they based their opinions.  She assigned weight based on these relationships and on the evidence that the evaluators used in reaching their opinion.  When the ALJ concluded that an opinion should receive lesser weight, she explained how the evidence of record, particularly Plaintiff's reported daily activities, demonstrated more activity on Plaintiff's part than the limitations permitted. With reference to Plaintiff's mental-health-related limitations, the ALJ explained how the record of Plaintiff's activities and treatment indicated that she could engage in more activity than the most restrictive opinions suggested.  The Court concludes that the ALJ explained in sufficient detail the weight she assigned the opinion evidence and that substantial evidence in the record supports the weight assigned.

The Plaintiff argues that the ALJ gave excessive weight to opinions provided by state agency examiners because they provided their opinions without the benefit of additional evidence in the record.  Plaintiff is correct that courts have found that an opinion that fails to use or cite relevant medical evidence is not entitled to significant weight.  See, e.g., Gunter v. Comm'r of Soc. Sec., 361 Fed. Appx. 197, 200 (2d Cir. 2010) (finding error by the ALJ in giving too much weight to a medical opinion that did not review a "complete

medical record" that demonstrated substantial injury to plaintiff's knees); Hidalgo v. Brown, 822 F.2d 294, 298 (2d Cir. 1987) (error to reject treating physician's opinion for another expert's when the second expert "did not have before him the complete medical records of the claimant" and one of those records "contained clinical findings confirming the treating physician's diagnosis; this may have altered [the expert's] conclusions."). Still, "[w]hile medical source opinions that are 'conclusory, stale, and based on an incomplete medical record' may not be substantial evidence to support an ALJ finding, this is not true when such opinions are supported by substantially similar findings in treatment notes and other opinions in the record." Carthron-Kelly v. Comm'r of Soc. Sec., No. 5:15-CV-0242, 2017 U.S. Dist. LEXIS 214747, at *12 (N.D.N.Y. Sept. 25, 2017) (quoting Griffith v. Astrue, No. 08-CV-6004, 2009 U.S. Dist. LEXIS 27533, 2009 WL 909630, at *9 n.9 (W.D.N.Y. Mar. 31, 2009)).

The Court finds that the ALJ did not err in the weight she assigned to the opinions of the state medical examiners. While medical reports exist subsequent to the opinions those experts rendered, the ALJ incorporated that evidence in determining the weight to assign those opinions. The ALJ examined that evidence in detail in her opinion, and used the Plaintiff's reported activities and the conclusions in the later medical records in determining that the record supported the findings in these opinions. The Plaintiff does not explain how the later-acquired evidence undermines the conclusions of these examiners or points to a substantial change in Plaintiff's condition. The existence of later medical records is not, by itself, sufficient to reject those earlier opinions. Substantial evidence supported the ALJ's conclusions in this respect.

Plaintiff also argues that the ALJ erred in giving great weight to Dr. Mohanty's

opinions, since Dr. Mohanty "is a pediatrician and thus not qualified to give an opinion in this case."  Plaintiff here misstates the regulation that applies.  In discussing the evaluation of medical source opinions, the regulations provide that "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her specialty than the medical opinon or prior medical finding a medical source who is not a specialist in the relevant area of speciality."  20 CFR 404.1520c(c)(5).  That rule does not disqualify the opinion of a non-specialist, but instead directs the ALJ to consider specialization in deciding how much weight to afford an opinion.  While the ALJ did not discuss Mohanty's specialization, the ALJ explained the weight assigned to the opinion based on the relation of that opinion to the medical evidence and Plaintiff's own reports of her activities.  See R. at 19.  Plaintiff does not explain how Dr. Mohanty's specialization colored his opinion or makes that opinion automatically unreliable.  The Court is not persuaded by Plaintiff's argument.  As such, the Court finds that substantial evidence supports the ALJ's conclusions in this respect as well.

### B.    "Cherry Picking" of the Evidence

Plaintiff also argues that the ALJ "cherry picked" the evidence to reach her conclusion about Plaintiff's disability.  She argues that the ALJ "minimized" her years of work at one particular job and her service in the Army Reserves in assessing her credibility and gave too much credit to her ability to perform activities of daily living in assessing her ability to perform work tasks.   The Plaintiff also argues that the ALJ ignored her consistent complaints of pain demonstrated in the medical records, as well as her use of medications to limit that pain, and that the ALJ failed to acknowledge a diagnosis of rheumatoid

arthritis contained in the record.  Plaintiff further argues that the ALJ minimized her mental impairments by failing to fully credit Plaintiff's statements about the intensity, persistence, and limitations caused by those symptoms.

"Although the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony, he cannot pick and choose evidence that supports a particular conclusion."  Smith v. Bowen, 687 F.Supp. 902, 904 (S.D.N.Y. 1988) (internal citation omitted).  An ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'"  Id. (quoting Ceballos v. Bowen, 649 F.Supp. 693, 700 (S.D.N.Y. 1986)).  An ALJ may not "cherry-pick the facts to support her conclusion."  Patel v. Comm'r of Soc. Sec., No. 1:20-cv-0237, 2021 U.S. Dist. LEXIS 183435, at *7 (E.D.N.Y. Sept. 24, 2021); see also, Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983) ("Although we do not require that, in rejecting a claim of disability, an ALJ must reconcile explicitly every conflicting shred of medical testimony, we cannot accept an unreasoned rejection of all medical evidence in a claimant's favor.") (internal citation omitted)).

To the extent that Plaintiff's complaint here is that the ALJ "picked and chose" the evidence that supported her opinion of Plaintiff's limitations, Plaintiff's position is unpersuasive.  The Court has examined the entire medical record, and the ALJ's opinion acknowledged and credited the parts of the record that indicated that Plaintiff complained of significant physical and mental limitations.  The ALJ's opinion also noted that parts of the medical record that indicated that Plaintiff had found relief from her pain with medication, and had not exhibited severe limitations on physical examination.  The ALJ also noted how Plaintiff's reported daily activity demonstrated physical capabilities.  The ALJ did not ignore contrary evidence, but weighed that evidence against the entire record.

21

Whatever the Court's assessment of such evidence would be on first pass, the Court here must find that substantial evidence existed to support the ALJ's findings of Plaintiff's physical limitations.[2]  Similarly, the ALJ had substantial evidence to support her findings on Plaintiff's mental limitations.  The ALJ cited the contrary evidence, but also pointed towards treatment records, Plaintiff's reports of her own daily activities, and expert opinion that supported a finding of fewer limitations than Plaintiff claimed.

To the extent that Plaintiff challenges the ALJ's credibility determination concerning Plaintiff's complaints of limitations, the Court is not persuaded that error occurred.  An ALJ must "set forth specific reasons for why she [finds]" a claimant's "testimony not credible," and such conclusions are "generally entitled to deference on appeal."  Selian v. Astrue, 708 F.3d 409, 420 (2d Cir. 2013).  As explained above, the ALJ pointed to specific evidence in the record, particularly in terms of Plaintiff's daily activities, as well as the medical evidence, in explaining why she did not entirely credit Plaintiff's claims of limitations.  The Court finds that Plaintiff had substantial evidence in the record to make this determination.

---

[2]Plaintiff contends that the ALJ ignored the finding of Victoria Michaels, MD, who examined Plaintiff on May 5, 2017 and assessed that she suffered from "rheumatoid arthritis with rheumatoid factor."  R. at 352.  The treatment records from that day indicate that Dr. Michaels treated Plaintiff's knee pain with 40 mg of Kenalog in each knee, and that the "indication for the procedure" was "seropositive rheumatoid arthritis."  The ALJ addressed this treatment.  Id. at 17.  The ALJ described the procedure and the substance of the diagnosis, noting both evaluations for range of motion in wrists, elbows, shoulders, knees, and ankles, and that "[t]here was no effusion of warmth on the knees but she was tender over the bilateral joing lines and there was crepitus in both knees."  Id.  The ALJ also noted that "Dr. Michaels stated that the claimant's symptom's were most consistent with evolving osteoarthritis/degenerative joint disease."  Id.  The ALJ here did not "cherry pick" the evidence to support her conclusions, but instead described the physician's general assessment and findings of limitations.

**C.     RFC**

Plaintiff argues that the ALJ lacked substantial evidence to support her RFC determination.  Had the ALJ properly weighed the opinion evidence, she would have found that Plaintiff's physical capacity did not permit her to perform medium work.  According to the Plaintiff, the evidence from her treating and consulting sources indicates that Plaintiff has limitations in "prolonged standing, walking, heavy lifting and carrying objects of significant weight which would preclude medium work."  Failing to include such limitations in the RFC, Plaintiff claims, represents error that requires reversal.  The Commissioner responds that the Plaintiff's position is based on the weights that the ALJ assigned to the opinion evidence.  Since, the Commissioner contends, the ALJ assigned appropriate weight to the opinion evidence, the Court must reject the Plaintiff's argument.

The Court agrees with the Commissioner that the Plaintiff's position is essentially an attack on the weight that the ALJ assigned to the different expert opinions.  The ALJ's position on Plaintiff's RFC grew out of the various opinions of the experts.  The ALJ's assessment of Plaintiff's ability to lift, carry, walk, and concentrate all find support in the those opinions.  The Court has found that the ALJ had substantial evidence for crediting the expert reports that the ALJ used to craft the RFC.  Since substantial evidence existed for those assessments, substantial evidence also exists for the RFC the ALJ established.  The ALJ explained the basis for her conclusions, and evidence in the medical records and testimony existed to support those conclusions.  The Court must reject the Plaintiff's position here too.

**V.     Conclusion**

23

For the reasons stated above, Plaintiff's motion for judgment on the pleadings, dkt. # 13, is hereby DENIED.  The defendant's motion for judgment on the pleadings, dkt. # 14, is hereby GRANTED.  The Clerk of Court is directed to enter judgment for the Defendant and close the case.

**IT IS SO ORDERED.**

Thomas J. McAvoy
Senior, U.S. District Judge

**Dated:** February 28, 2022

24